AMERICAN GENERAL            :        CIVIL ACTION NO. 3:07-222
LIFE INSURANCE COMPANY

VERSUS                      :        SECTION C( JUDGE TYSON)

EVELYN JACKSON WILKES and
QUEEN ESTER WILKES HINKLE   :        MAGISTRATE.I (RIEDLINGER)

## MEMORANDUM IN OPPOSITION TO MOTION
## FOR SUMMARY JUDGMENT FILED
## BY EVELYN JACKSON WILKES

MAY IT PLEASE THE COURT:

I.      Relevant Facts

On or about April 10, 2002 and November 17, 2003, John Henry Wilkes

purchased a life insurance policy, both for $100,000.00 each (see Complaint In

Interpleader, paragraphs 6 and 7, document 1). On December 20, 2005, Defendant,

Queen Ester Wilkes Hinkle, the only child of John Henry Wilkes, was the named

primary beneficiary on both policies (see Complaint In Interpleader, paragraph 8,

document 1).

By way of somewhat recent backgroud on Mr. Wilkes, starting in

approximately June of 2004, until approximately January of 2006, Gwendolyn

Starwood was a caretaker of John Henry Wilkes. Ms. Starwood was also a

relative of Mr. Wilkes, in that, at a point in time, Ms. Starwood's cousin was

married to Mr. Wilkes (see affidavit of Gwendolyn Starwood, attached as Exhibit

A).   As caretaker, Ms. Starwood's initial duties included cooking, cleaning,

making sure he took a bath and got properly dressed and groomed, taking care of

his transportation needs and medication needs and, in general, looking after his

daily needs.

1

In connection with Ms. Starwood's duties as caretaker, Ms. Starwood was in contact with Mr. Wilkes on a daily basis.

As noted above, Ms. Starwood began her duties in June of 2004. When Ms. Starwood began her duties in June of 2004, Mr. Wilkes showed signs of forgetfulness and signs of confusion in simple day to day living. In simple terms, his mind would "come and go."

As time progressed, Mr. Wilkes' mental condition became progressively worse. Mr. Wilkes became more forgetful, suffered more and more memory loss, and became more and more unable to handle his daily affairs.

By the end of 2005, Mr. Wilkes would forget that Ms. Starwood always came to his home to get him ready for the day and, if necessary, to pick him up for his appointments, as she had a key to his home. As a result, she would sometimes find him wondering some distance from his home. When Ms. Starwood would find him, she would question him as to what he was doing. It was obvious that he had forgotten that Ms. Starwood was to pick him up. On one occasion, Ms. Starwood found him walking still wearing his pajama bottoms. Because of the foregoing, Ms. Starwood resorted to placing a note in his wallet, stating his name and address, and how she could be located, in the event he got lost and she was unable to find him.   In light of the foregoing, Ms. Starwood, at a point in time, moved Mr. Wilkes in with Ms. Starwood's family for a short time;  however, he eventually returned to his home in Savoy Plaza, Baton Rouge, Louisiana.

At the conclusion of Ms. Starwood's duties with Mr. Wilkes, it was necessary for her to assist him in handling his money matters and taking care of his personal affairs (see affidavit of Gwendolyn Starwood, attached as Exhibit A).

2

Toward the end of November of 2005, John Henry Wilkes, met on a public bus, Defendant, Evelyn Jackson Wilkes (see Evelyn Jackson Wilkes depo., (hereinafter Wilkes depo) pg. 143, 144, 18, 19, attached as Exhibit E). In December of 2005, Mr. Wilkes moved into the apartment of Evelyn Jackson Wilkes (see Wilkes depo., pg. 143, 90), and they married on or about March 11, 2006. (see Wilkes depo, pg. 90, 22 ). On March 7, 2006, apparently just before his marriage, Mr. Wilkes changed the named beneficiary on life insurance policy number X9019202 to Evelyn Jackson Wilkes, and shortly thereafter, on March 29, 2006, substituted Evelyn Jackson Wilkes as beneficiary for Queen Wilkes Hinkle on the second $100,000.00 policy, which bears policy number X9011409 (see Wilkes depo, Exhibit 5 & 13).

Based upon Ms. Starwood's observations of Mr. Wilkes, from June of 2004 until January of 2006, and her contact with him on a daily basis, Ms. Starwood believes that, from the latter part of 2005, until Ms. Starwood stopped caring for John Henry Wilkes, in January, 2006, [1] John Henry Wilkes would not have understood the meaning and end result of the change in beneficiary forms. (See Wilkes depo, Exhibits 5 & 13)

After Ms. Starwood's employment with Mr. Wilkes ended, they still spoke, occasionally, by phone. When they would sometimes talk, he would sometimes be crying. Ms. Starwood could hear in the background who she later learned to be his wife belittling him, calling him stupid and retarded. Mrs. Wilkes would eventually hang up the phone. On one occasion, when he was

---

[1]  In her deposition, Evelyn Jackson Wilkes testified that Mr. Wilkes' physical and mental health remained constant from November, 2005 to June, 2006 (see Wilkes depo, pg. 145).

3

crying, he stated "I am in trouble, and I can't get out." Sometimes during these phone conversations, Mrs. Wilkes, his then wife, would pick up the phone, curse her, state that she was in charge, and hang up the phone. (See affidavit of Gwendolyn Starwood, attached as Exhibit A).

It appears that Mr. Wilkes' health took a noticeable turn for the worse, in July of 2006, when he developed difficulty with his breathing (see Wilkes depo., pg. 149, lines 1-4). In September of 2006, Mr. Wilkes was hospitalized for five (5) days with what was later diagnosed as blood clots in his lungs (see Wilkes depo., pg. 148, 149). Shortly thereafter, in October of 2006, Evelyn Jackson Wilkes contacted Mr. Wilkes' life insurance agent and sought to add an additional $100,000.00 of life insurance on the life of Mr. Wilkes (see affidavit of George K. Francis, Jr., attached as Exhibit B).

To expand on the contact with the life insurance agent, George K. Francis, Jr., Mr. Francis received a phone call believed to be in the fall of 2006 from Evelyn Jackson Wilkes. In this phone call, she was inquiring into adding an additional $100,000.00 of coverage on the life of John Henry Wilkes. Mr. Francis met with John Henry Wilkes regarding this request (see affidavit of George K. Francis, Jr., Exhibit B).

In meeting with Mr. Wilkes, George K. Francis, Jr. immediately noticed in a change in the physical appearance and/or apparent health of John Henry Wilkes, from the time they last met in early 2006 until this meeting in the fall of 2006. To be more particular, his speech was slurred and he simply did not look to be in good health. Based upon Mr. Francis' observations, he did not think Mr. Wilkes would qualify for additional coverage and suggested that he speak with

4

AIG  about attempting to increase his policy limits, since he already had coverage with AIG.  Mr. Francis did not follow-up on Mr. Wilkes' attempts at increasing the life insurance coverage with AIG (See affidavit of George K. Francis, Jr., Exhibit B).

By way of backgrond on Mr. Francis, Mr. Francis is an insurance agent and has been licensed to sell life insurance since September, 1997.

Mr. Francis was employed by AIG Insurance Company from approximately January, 2000 until August, 2005.

In connection with his employment with AIG, Mr. Francis sold to John Henry Wilkes the two life insurance policies which are at issue in this proceeding.

In connection with one of his policies, his now deceased wife was named the beneficiary, and, as to the second policy, his only child, a daughter, Queen Ester Wilkes Hinkle, was eventually named the beneficiary.  Both policies had a face value of $100,000.00 each.

In the early part of the year 2006, and after Mr. Francis had left his employment with AIG, he met John Henry Wilkes and his new wife, Evelyn Jackson Wilkes, when he was entering, and they were leaving, the offices of Olinde Financial Group.  Mr. Francis later learned that Mr. Wilkes had changed the beneficiary of both of the policies Mr. Francis had sold to Mr. Wilkes, naming Evelyn Jackson Wilkes as beneficiary of both policies.  Mr. Francis also learned that the change of beneficiaries had been made irrevocable. (See affidavit of George K. Francis, Jr., Exhibit B).

At the time of the initial sale of the two policies,  Mr. Francis and Mr.

Wilkes did not discuss making the beneficiary designation irrevocable.  In fact, in

all his years of selling insurance, the only policies Mr. Francis can ever recall the

beneficiary designation being made irrevocable are the two at issue in this case.

Mr. Francis was not even aware that a beneficiary designation could be made

irrevocable.

At some point during Gwendolyn Starwood's care of John Henry Wilkes,

Mr. Wilkes purchased for her a bedroom set, in recognition of Ms. Starwood's

care of him and his former deceased wife.  After Ms. Starwood was no longer

caring for Mr. Wilkes, she received a phone call from Evelyn Jackson Wilkes,

who was at the office of one Dr. Imran, a psychiatrist, asking for the return of the

bedroom set given to her by John Henry Wilkes.  Mrs. Wilkes indicated that Mr.

Wilkes was incompetent to purchase such property for her and that she would

be receiving a letter from Dr. Imran indicating that fact. (See affidavit of

Gwendolyn Starwood, Exhibit A).

John Henry Wilkes died on December 9, 2006.  (See Complaint in

Interpleader, paragraph ten (10) document 1)

II.     Questions Presented

A. Is a material issue of fact in this case the presence of fraud or fraudulent

practices, as defined in Louisiana law?

B.  In the alternative, is "undue influence" a material issue of fact in this

case?

C. If either of the preceding questions are answered in the affirmative,  is a

material issue of fact whether John Henry Wilkes had the capacity to contract at

the time he executed the change of beneficiary forms? Stated another way, is a

material issue of fact whether John Henry Wilkes was deprived of reason at the

time at issue?

D.  Notwithstanding the answers to the preceding three questions, is a

material issue of fact in this case whether John Henry Wilkes "consented" to the

purported contract at issue, or was consent vitiated by error or fraud?

III.    Discussion

A predominant basis of Evelyn Jackson Wilkes' motion for summary

judgment is Article 1926 of the Louisiana Civil Code.  Article 1926 provides the

following:

> "       A contract made by a noninterdicted
> person deprived of reason at the time of contracting
> may be attacked after his death, on the ground of
> incapacity, only when the contract is gratuitous, or it
> evidences lack of understanding, or was made within
> thirty days of his death, or when application for
> interdiction was filed before his death."

Evelyn Jackson Wilkes cited the case of Standard Life Insurance

Company v. Taylor, 428 So.2d 1294 (La. App. 3 Cir. 1983) for the proposition that

the execution of a change of beneficiary form is not a gratuitous  contract.

However, it is important for another legal principle, relevant to the case before

the Court; namely, a qualification or exception to the language of Civil Code

Article 1926.

The exception or qualification to the general rules set forth in Article

1926, Louisiana Civil Code, is where fraud or fraudulent practices is involved.  As

the cases quoted and cited below reflect, where fraud or fraudulent practices is or

are shown, " a contract made by a noninterdicted person deprived of reason at the

time of contracting may be attacked after his death, on the ground of incapacity,"
even if the contract is nongratuitous, or the contract itself does not reflect a lack
of understanding, or was not entered into within thirty (30) days of death, or in
the absence of an interdiction filed prior to death.

The case of <u>Butler v. Austin</u>, 150 So.449 (La. App. 2d Cir. 1933), also
involved a change of beneficiary in a life insurance policy and the mental
competency of the individual who effectuated the change in beneficiary.  In <u>Butler</u>
<u>v. Austin</u>, supra, the Court wrote the following:

> " . . . the door is closed to the widow and heirs of
> deceased to attack such a contract because of
> incompetency, due to insanity, <u>unless fraud or</u>
> <u>fraudulent practices on the part of the other party,</u>
> <u>bearing upon a material part of the contract, be alleged</u>
> <u>or proved.</u>" (See also <u>Roach v. Chaisson</u>, 319 So.2d 872
> (La.App. 3 Cir. 1975)(emphasis supplied).

Or, as was stated in a Tulane law review article appearing in volume 22,
page 601:

> "Whenever the ground of avoidance of a contract is
> fraud, the insanity of the victim of the fraud may be
> shown, whether he be dead or alive, or subsequently
> interdicted."

In light of the above, the next discussion must be an analysis of evidence of
fraud or fraudulent practices in this matter.

However, before entering into a discussion of fraud, and how it relates to
this case, it is important to first define fraud, and then discuss the standard of proof
in such a case.

Fraud is defined in Article 1953 of the Civil Code of Louisiana as "a
misrepresentation or a suppression of the truth made with the intention either to

obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." The commentary to article 1953 states the following:

> " b) Under this article, fraud may result not only from an act, such as false assertion or suppression of the truth, but also from a failure to act, such as silence, that is calculated to produce a misleading effect.
>
> c) Fraud, like its French equivalent "dol", need not be a criminal act. Intentional fault of a quasi-delictual nature suffices to constitute the kind of fraud that vitiates a party's consent.

In addition to defining fraud or fraudulent practices, it is important to note the type of proof needed to establish fraud or fraudulent practices. On this point, article 1957 of our Civil Code provides the following:

> "Fraud need only be proved by a preponderance of the evidence and <u>may be established by circumstantial evidence</u>." (emphasis supplied).

Commenting on the wisdom in allowing fraud to be established by circumstantial evidence, the commentary to Article 1957 states the following:

> " Courts have always acknowledged how difficult it is for one to prove fraud by positive and direct testimony, realizing full well that those who indulge in it generally prepare themselves in such a manner as to cover up and leave no traces of their practice behind them." 1 So.2d 445, at 450.
>
> In an earlier case, <u>Simony-Gregory Dry-Goods Co. v. Newman</u>, 50 La.Ann 338, 23 So. 329, 331 (1898), the court said: 'While fraud is never to be presumed, courts of justice recognize the cunning concealment in which it shrouds its devious practices and the difficulty of tracing it by direct proof, . . . ' In <u>Vanguard Finance, Inc. v. Smith</u>, 256 So.2d 662, 664 (La.App. 4th Cir. 1972), it was asserted that: '(F)raud must be proved by one who alleges fraud, but because of the nature of fraud it

sometimes must be inferred from the existence of
highly suspicious conditions of events.' "

In the case before the court, it is not necessarily one fact or one situation
that is the basis for the fraud allegation, rather it is a combination of facts from
which a reasonable person could reasonably conclude that John Henry Wilkes
was a victim of fraud, as defined above.

Hence, it is in light of the above, that one must consider the following
chain of events and/or conditions:

(1)    the fragile mental makeup of John Henry Wilkes, (see affidavit of
Gwendolyn Starwood, attached as Exhibit A).

(2)    the extremely short time line from meeting on a bus, to John
Henry Wilkes moving in with Evelyn Jackson Wilkes, to their marriage March 11,
2006 (see Wilkes depo., pg . 22, 90, but see Exhibit 5 to Wilkes depo-designated
a wife on change of beneficiary form executed on March 7, 2006);

(3)    the change in beneficiary request on March 7, 2006,  on policy
number X9019202, apparently before the marriage (see Wilkes depo, pg. 90),
and the change in beneficiary request on March 29, 2006, on policy number
X9011409, just a few weeks after the marriage (see exhibits 5 and 13 to Wilkes
depo.),

(4)    that, other than the date and signature of John Henry Wilkes, all
other hand written inserts on the change in beneficiary forms were supplied by
the hand Evelyn Jackson Wilkes, (see pgs. 93-95, depo. of Wilkes)

(5)    both change in beneficiary designations were made irrevocable;
(see pg 95, Wilkes depo)

(6)     at a time when John Henry Wilkes' health was failing, October of 2006, after experiencing breathing difficulties over the course of the preceding few months (see Wilkes depo., pg. 149)  and after he had been hospitalized for five (5) days in September of 2006, with blood clots in his lungs (see Wilkes depo., pg. 148, 149),  Evelyn Jackson Wilkes inquired into adding an additional $100,000.00 in life insurance coverage on the life of John Henry Wilkes. (see affidavit of George K. Francis, Jr., attached as Exhibit B)

(7)     John Henry Wilkes seeking to recover property in which he at one time may have had an ownership interest, i.e. silver, furniture. (see affidavit of Louise Wilkes and Gwendolyn Starwood, attached as Exhibits C  and A, respectively).

(8)     The efforts of John Henry Wilkes to adopt a major son of Evelyn Jackson Wilkes for the financial gain of the son upon the death of John Henry Wilkes (See Wilkes depo, pg. 52-54)

(9)     the termination of Queen Ester Wilkes Hinkle, the only child of John Wilkes Hinkle, with whom he had a close, loving relationship, and who he wished to assist financially (see affidavit of Queen Hinkle and Louise Wilkes, attached as Exhibits D and C, respectively).

Further elaboration is warranted on some elements of the chain noted above.

First, as to Evelyn Jackson Wilkes' filling out the entire change of beneficiary form, with the exception of the date and signature, and making the beneficiary  designation irrevocable, the following colloquy, from the deposition of Evelyn Jackson Wilkes, is important.  The colloquy is as follows:

Q. . . .   everything on this form is your handwriting?

A.      Uh-huh.

Q.      except for Mr. Wilkes' signature:

A.      and the date.

. . .

Q.      But as far as this form goes, this was just you filling out the form?

A.      Yes.

Q.      Did you all do that at home?

A.      Yes.

Q.      So you didn't go to American General's office to do that?

A.      No.

...

Q.      Did you know what irrevocable beneficiary meant?

A.      No, that's what I'm saying, I didn't know exactly, but I thought it meant it can't be changed and you hear so much bad news. It happened to my sister. . . . my sister's husband had a drinking problem and he went out one day with his daughter from a previous marriage and changed the beneficiary of the policy and he and my sister had just had a baby, an infant and they were together more than 15 years. He would have never wanted her not to have the insurance to take care of his children, but his daughter came to the house and got him to drinking and left the house with him and the next thing she knows, when he

12

died, on that date, she got him to change the beneficiary while he
was under the influence of alcohol, and so I know that people
can do that.

Then a friend told me something devious somebody had
did about insurance policies, so I just thought. . . (See Wilkes
depo., pgs. 93-95 , pg. 49)

In light of the above colloquy, it is evident that Ms. Wilkes did more than
just fill out the form.  Her thought process and feelings went into placing an "x"
in the irrevocable box.  It can be argued, and is being argued, that, given Mr.
Wilkes mental state (see affidavit of Gwendolyn Starwood, attached as Exhibit
A), that it was Ms. Wilkes who both literally and substantively filled out the
change of beneficiary forms, not John Henry Wilkes.

Also listed above, as a link in the chain, is the proposed adoption of Ms.
Wilkes' son, for the financial gain of the son when Mr. Wilkes died.  On this
point, consider the following colloquy, also from the deposition of Evelyn Jackson
Wilkes:

> Q.     ... Let me turn to your son that you claim Mr.
>        Wilkes tried to adopt; correct?
>
> A.     Uh-huh.  That I claim?  I have the documents from
>        the VA that my husband wrote.
>
> Q.     The effort was made to adopt your son;  correct?
>
>        ...
>
> Q.     So with the VA Mr. Wilkes purportedly sought to
>        adopt your son, correct?

A.      Yes.

Q.      And that would have made your son entitled to
        benefits; would it not have?

A.      Yes.

Q.      And what type of benefits would your son have
        received had he been adopted—had he adopted
        your son. . . .

A.      I think they would have added maybe $200.00, a
        little more

        ...

Q.      How old was your son at the time he was trying to
        adopt him?

A.      . . . he would have been more like 22, maybe.

        ...

Q.      Your son would have received benefits as a result
        of Mr. Wilkes' death;  correct?

A.      Yes. . . .

Q.      Was the adoption carried out?

A.      No.

Q.      Do you know why it didn't go through?

A.      Yes.

Q,      Why is that?

. . .

14

A.    So $200.00 would have only been money

subtracted from his disability income, so it wasn't .

. . practical." (Wilkes depo., pgs 52-54)

Thirdly, the affidavit of George K. Francis, Jr. clearly reflects that it was Ms. Wilkes who first inquired into adding an additional $100,000.00 of coverage, not Mr. Wilkes (see Exhibit B). While recognizing that credibility determinations are not applicable to summary judgment proceedings, it is worthy to note that in her deposition Evelyn Jackson was adamant that she did not initiate seeking the additional $100,000.00 of coverage (see Wilkes depo, pgs. 27-28).

Keeping in mind the comments to Article 1957 of the Louisiana Civil Code, allowing circumstantial evidence to prove fraud due to the nature of fraud and the difficulty of proving it by direct evidence, one must conclude that whether fraud or fraudulent practices exist is a material issue of fact. It is only at a trial on the merits, and after evaluating live testimony, that a determination should be made whether the chain of events or circumstantial evidence noted above legally establishes fraud or fraudulent practices, as defined by Louisiana law.

In the alternative, should the Court find that fraud is not a material of fact, the Court should find that whether Evelyn Jackson Wilkes exerted "undue influence" over Mr. Wilkes in making the beneficiary changes is a material issue of fact, and that such a finding would also allow a challenge to Mr. Wilkes' capacity to contract.

While Article 1479 of the Louisiana Civil Code deals with donations, the same principles should be applicable to the case at hand. Article 1479 provides the following:

"A donation intervivos or mortis causa should be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute volition of the donee or other person for the volition of the donor."

In the case of Conville v. Bank One, Louisiana, N.A., 920 So.2d 397 (La. App. 2 Cir. 2006) the Court wrote:

> Article 1479 provides for the nullification of donations procured through influence impairing the volition of the donor. Comment (b) to that article provides some instructive discussion on the issue of undue influence. It reads in pertinent part:

> This Article intentionally does not use the word "undue" to describe the influence . . . but instead defines the influence as being of such a nature that it destroys the free agency of the donor." (See also Succ. of Reeves, 704 So.2d 252 (La. App. 3. Cir. 1997).

### Capacity to Contract

As pointed out above, if fraud or fraudulent practices are shown to exist, the usual challenges to capacity to contract exist and are at play.

On the issue of capacity to contract, Article 1918 of the Louisiana Civil Code provides the following:

> " All persons have capacity to contract, except . . . and person deprived of reason at the time of contracting." (See also La.R.S. 22:612).

16

The comments to Article 1918 are helpful in defining what is meant by the term "persons deprived of reason." On this point, the comments to Article 1918 state:

> "(b)    The expression 'persons deprived of reason' is designed to include all of the varieties of derangement that have been acknowledged by the Louisiana jurisprudence . . . senility."

It is in light of the above principles of law that the Court in <u>In the Matter of Adoption of Michael and Jimmy Smith</u>, 578 So. 2d 988,(La.App. 4th Cir. 1991), articulated the well established legal principle that "lack of capacity constitutes the absence of an essential requirement for the validity of a contract."

For all the reasons noted above, whether John Henry Wilkes possessed the requisite capacity to contract is a material issue of fact, thus precluding the granting of the motion for summary judgment (see affidavit of Gwendolyn Starwood, attached as Exhibit A.)

<u>Error</u>

In addition to the issue of capacity, the factually related issue of error also comes into play in the case before the Court.

As the Court is well aware, " a contract is formed by the consent of the parties." (Article 1927, La. Civil Code). As the Court is also well aware," consent may be vitiated by error, fraud . . ." (Article 1948, La. Civil Code).

For the reasons noted in this opposition, error and fraud are serious factual issues in this matter.

It is also important to note that Article 1926, Louisiana Civil Code, only applies to the issue of capacity; it is not applicable to the issue of consent, and whether consent was vitiated by error and/or fraud. As one can see, Article 1926

17

uses the words "on the ground of incapacity", and does not mention the concept of error.

Thus, whether the necessary element of consent was vitiated by error or fraud are also material issues of fact in this matter, thus precluding the granting of summary judgment.

### Summary Judgment

As the Court is well aware, Rule 56, FRCVP, in its pertinent part, provides the following:

"(c). . . the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law. . . . "

Considering the affidavits filed in this matter, the pleadings and the deposition of Evelyn Jackson Wilkes, for the reasons noted above, it is clear that a material issues of fact do exist. Therefore, the motion for summary judgment should be denied.

BY ATTORNEY:

John N. Samaha
820 North Street
Baton Rouge, LA 70802
Telephone (225) 336-4052
Facsimile (225) 336-4055

18

## CERTIFICATE

I CERTIFY that a copy of the foregoing memorandum has been

served on all parties to this proceeding either electronically, pursuant to

Court procedure, or by U.S. Mail, postage prepaid, to the following:

>       Covert Geary
>       cgeary@joneswalker.com
>
>       Ford Acceptance Corporation
>       c/o Phillip Mandell
>       39 South Lasalle Street, Suite 1220
>       Chicago, IL 60603
>
>       Daniel R. Atkinson, Jr.
>       Atkinson@pabmb.com

Baton Rouge, Louisiana, this 10th day of January, 2008.


John N. Samaha


Hinkle(q)-memo1217

AMERICAN GENERAL                    :          CIVIL ACTION NO. 3:07-222
LIFE INSURANCE COMPANY

VERSUS                              :          SECTION C (JUDGE TYSON)

EVELYN JACKSON WILKES and
QUEEN ESTER WILKES HINKLE   :          MAGISTRATE 1 (RIEDLINGER)

## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned authority, personally came and appeared:

Gwendolyn Starwood

who, after being duly sworn, did state:

Affiant was a relative (Mr. Wilkes married to a cousin) and caretaker of the late John Henry Wilkes (Mr. Wilkes) starting approximately in June of 2004, until approximately January of 2006. As caretaker, Affiant's initial duties included cooking, cleaning, making sure he took a bath and got properly dressed and groomed, taking care of his transportation needs and medication needs and, in general, looking after his daily needs.

In connection with Affiant's duties as caretaker, Affiant was in contact with Mr. Wilkes on a daily basis.

As noted above, Affiant began her duties in June of 2004. When Affiant began her duties in June of 2004, Mr. Wilkes showed signs of forgetfulness and signs of confusion in simple day to day living. In simple terms, his mind would "come and go."



**EXHIBIT**

**A**

As time progressed, Mr. Wilkes' mental condition became progressively worse. Mr. Wilkes became more forgetful, suffered more and more memory loss, and became more and more unable to handle his daily affairs.

By the end of 2005, Mr. Wilkes would forget that Affiant always came to his home to get him ready for the day and, if necessary, to pick him up for his appointments, as she had a key to his home. As a result, she would sometimes find him wondering some distance from his home. When Affiant would find him, she would question him as to what he was doing. It was obvious that he had forgotten that Affiant was to pick him up. On one occasion, Affiant found him walking still wearing his pajama bottoms. Because of the foregoing, Affiant resorted to placing a note in his wallet, stating his name and address, and how she could be located, in the event he got lost and she was unable to find him.   In light of the foregoing, Affiant, at a point in time, moved Mr. Wilkes in with Affiant's family for a short time;  however, he eventually returned to his home in Savoy Plaza, Baton Rouge, Louisiana.

At the conclusion of Affiant's duties with Mr. Wilkes, it was necessary for her to assist him in handling  his money matters and taking care of his personal affairs.

After Affiant's employment with Mr. Wilkes ended, they still spoke, occasionally, by phone.   When they would sometimes talk, he would sometimes be crying. Affiant could hear in the background, who she later learned to be his wife, Evelyn Jackson Wilkes (Mrs. Wilkes), belittling him, calling him stupid and retarded. Mrs. Wilkes would eventually hang up the phone. On one occasion, when he was crying, he stated "I am in trouble, and I can't get out." Sometimes during

these phone conversations, Mrs. Wilkes, his then wife, would pick up the phone, curse her, state that she was in charge, and hang up the phone.

It has been represented to Affiant that the documents attached to this affidavit as exhibits A and B are change of beneficiary forms signed by John Henry Wilkes.  From the latter part of 2005, until Affiant stopped caring for John Henry Wilkes, John Henry Wilkes would not have understood the meaning and end result of signing those documents attached as Exhibits A and B.

At some point during Affiant's care of John Henry Wilkes, he purchased for her a bedroom set, in recognition of Affiant's care of him and his former wife.  After Affiant was no longer caring for Mr. Wilkes, Affiant received a phone call from Evelyn Jackson Wilkes, who was at the office of one Dr. Imran, a psychiatrist, asking for the return of the bedroom set given to her by John Henry Wilkes.  Mrs. Wilkes indicated that Mr. Wilkes was incompetent to purchase such property for her and that she would be receiving a letter from Dr. Imran indicating that fact.

_____
Gwendolyn Starwood


Sworn to and subscribed, before me, this 27th day of December, 2007.


_____
John N. Samaha, Notary Public
La. State Bar Roll #11676


Hinkle(q)-aff

X9019202

03/13/2006 13:46 8017276 998P

# AIG AMERICAN GENERAL

**Change of Beneficiary**

[X] **American General Life Insurance Company (AGL),**
[X] Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
[ ] Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
[ ] **The Old Line Life Insurance Company of America (OLL),** P.O. Box 4373, Houston, TX 77210-4373
Members of American International Group, Inc.
Instructions for completing this form are listed on the back.

| | | |
|---|---|---|
| **1.** | **CONTRACT IDENTIFICATION** | CONTRACT No: X9019202 |
| | | OWNER: John H. Wilkes   225.773.85 33084   SSN/TIN or EIN: 092 28 6501 |
| | [X] Check Here if New Address | ADDRESS: 565 McClelland Dr. 225   PHONE No: 225.355.614 L.H. |
| | | Baton Rouge LA 70805   Cell 562.506.7176 8x7 |
| | | EMAIL ADDRESS (optional): EJackson1948@msn.com |
| | | INSURED/ANNUITANT (if other than Owner): |

| | | |
|---|---|---|
| **2.** | **BENEFICIARY DESIGNATIONS** | One or more of the following may be checked.  If nothing is checked, the designation will be in effect for the base insured only. |
| | | Designation is in effect for:  [ ] Base Insured   [ ] Spouse Insured   [ ] Other _____ |
| | **A. PRIMARY** *Address Required* | Full Name        Relationship    Address       SSN        Percentages (if applicable) Must total 100 |
| | | Evelyn Jackson Wilkes, wife |
| | | 5665 McClelland Dr. 225, Baton Rouge, LA 70805 |
| | | 099.42.1832 SSN |
| | | If a living or non-testementary trust is designated as a primary beneficiary, complete the following: |
| | | N/A |
| | | _____ Dated: _____ |
| | | Legal Name of Trust |
| | **B. CONTINGENT** *Address Required* | Full Name        Relationship    Address       SSN        Percentages (if applicable) Must total 100 |
| | | N/A |
| | | Dated: _____ |
| | | Legal Name of Trust |

| | | |
|---|---|---|
| **3.** | **OPTIONAL CLAUSES** | One or more of the following may be checked if desired: |
| | | [ ] POSTPONEMENT CLAUSE - COMMON DISASTER   [ ] CHILDREN'S CLAUSE - PER STIRPES |
| | | [ ] MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN   [X] IRREVOCABLE BENEFICIARY |
| | | Dated: _____ |
| | | Name of Trust/Trustee |

| | | |
|---|---|---|
| **4.** | **SIGN HERE FOR ABOVE REQUEST** | The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant. |

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

X _John Wilkes_ ____   3-7-06
Signature of Owner   Date        Signature of Co-owner   Date
                                (or other party having interest in contract)

_____   _____
Witness   Date

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

EXHIBIT #5
PENGAD 800-631-6989

Page 1 of 2

EXHIBIT A

04/03/2006 14:59 0017330 6225

# AIG AMERICAN GENERAL

**Change of Beneficiary**

**American General Life Insurance Company (AGL)**
**AIG Life Insurance Company**
**AIG Life Insurance Company of Puerto Rico**
*Member companies of American International Group, Inc.*
☒ Fixed Life Service Center - P.O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P.O. Box 4880, Houston, TX 77210-4880
**Instructions for completing this form are listed on the back.**

*Please print or type all information except signatures.*

| | | |
|---|---|---|
| **1. CONTRACT IDENTIFICATION** ☒ Check Here if New Address | CONTRACT No.: X9011409 | |

OWNER: JOHN HENRY WILKES   SSN/TIN OR EIN: 092.28.6501
ADDRESS: 5665 McClelland Dr.   PHONE No.: 2258108529
#225, Baton Rouge, LA 70805   cell
EMAIL ADDRESS (optional): Wolfgang_99@MSN.COM
INSURED/ANNUITANT (if other than Owner): _____

**2. BENEFICIARY DESIGNATIONS**

One or more of the following may be checked. If nothing is checked, the designation will be in effect for the base insured only. Must be of legal age, if not Minor Beneficiary Clause must be completed. Beneficiary Designation is in effect for: ☐ Base Insured ☒ Spouse Insured ☐ Other _____

**A. PRIMARY**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (Must total 100%) |
|---|---|---|---|---|
| Evelyn Jackson Wilkes, Spouse, 5665 McClelland Dr. 225 Baton Rouge, LA 70805; SSN: 094.42.1832 | | | | 100% |

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:
Legal Name of Trust _____ Dated: _____

**B. CONTINGENT**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Dated: _____
Legal Name of Trust

**3. OPTIONAL CLAUSES**

One or more of the following may be checked if desired:
☐ POSTPONEMENT CLAUSE - COMMON DISASTER   ☐ CHILDREN'S CLAUSE - PER STIRPES
☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN   ☒ IRREVOCABLE BENEFICIARY _____
Dated: _____
Name of Trust/Trustee

**4. SIGN HERE FOR ABOVE REQUEST**

The undersigned contract owner hereby revokes any previous beneficiary designation and any option of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant. Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, an (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

Signature: John H Wilkes   3-29-06
*Signature of Owner*   *Title*

_____   _____
*Signature of Co-Owner, Assignee, Witness*   *Title*

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE:**

108 Rev0904

Exhibit B

Member of American International Group, Inc.
P.O. Box 4880 • Houston, TX 77210-4880 • 800-528-2011 • TDD 217-528-2011 • www.americangeneral.com
Securities Distributed by American General Equity Services Corporation

EXHIBIT #13

AMERICAN GENERAL : CIVIL ACTION NO. 3-07-222
LIFE INSURANCE COMPANY

VERSUS : SECTION C (JUDGE TYSON)

EVELYN JACKSON WILKES and
QUEEN ESTER WILKES HINKLE : MAGISTRATE 1 (RIEDLINGER)

---

## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned authority, personally came and appeared:

### GEORGE K. FRANCIS, JR.

who, after being duly sworn, did state:

Affiant is an insurance agent and has been licensed to sell life insurance since September, 1997.

Affiant was employed by AIG Insurance Company from approximately January, 2000 until August, 2005.

In connection with his employment with AIG, Affiant sold to John Henry Wilkes the two life insurance policies which are at issue in this proceeding.

In connection with one of his policies, his now deceased wife was named the beneficiary, and, as to the second policy, his daughter, Queen Ester Wilkes Hinkle,



EXHIBIT
B

was eventually named the beneficiary. Both policies had a face value of $100,000.00 each.

In the early part of the year 2006, and after Affiant had left his employment with AIG, he met John Henry Wilkes and his new wife, Evelyn Jackson Wilkes, when he was entering and they were leaving the offices of Olinde Financial Group. Affiant later learned that Mr. Wilkes had changed the beneficiary of both of the policies Affiant had sold to Mr. Wilkes, naming Evelyn Jackson Wilkes as beneficiary of both policies. Affiant also learned that the change of beneficiaries had been made irrevocable.

At the time of the initial sale of the two policies, Affiant and Mr. Wilkes did not discuss making the beneficiary designation irrevocable. In fact, in all his years of selling insurance, the only policies Affiant can ever recall the beneficiary designation being made irrevocable are the two at issue in this case. Affiant was not even aware that a beneficiary designation could be made irrevocable.

Affiant received a phone call believed to be in the fall of 2006 from Evelyn Jackson Wilkes. In this phone call, she was inquiring into adding an additional $100,000.00 of coverage on the life of John Henry Wilkes. Affiant met with John Henry Wilkes regarding this request.

In meeting with Mr. Wilkes, Affiant immediately noticed in a change in the physical appearance and/or apparent health of John Henry Wilkes, from the time they met in early 2006 until this meeting in the fall of 2006. To be more particular, his speech was slurred and he simply did not look to be in good health. Based upon Affiant's observations, he did not think Mr. Wilkes would qualify for additional

coverage and suggested that he speak with AIG about attempting to increase his policy limits, since he already had coverage with AIG. Affiant did not follow-up on Mr. Wilkes' attempts at increasing the life insurance coverage with AIG.

_____
GEORGE K. FRANCIS, JR.

SWORN TO AND SUBSCRIBED, before me, this 20th day of December, 2007.

_____
John N. Samaha,
NOTARY PUBLIC
La. State Bar Roll #11676

Hinkle(q)-aff1218

AMERICAN GENERAL         :       CIVIL ACTION NO. 3-07-222
LIFE INSURANCE COMPANY

VERSUS                    :       SECTION C (JUDGE TYSON)

EVELYN JACKSON WILKES and
QUEEN ESTER WILKES HINKLE  :       MAGISTRATE 1 (RIEDLINGER)

## AFFIDAVIT

**STATE OF OHIO**

**COUNTY OF HAMILTON**

BEFORE ME, the undersigned authority, personally came and appeared:

### LOUISE WILKES

who, after being duly sworn, did state:

Affiant is the former wife of John Henry Wilkes.

Affiant and John Henry Wilkes were married on May 15, 1986 and divorced on November 19, 1998.

As a part of the divorce proceeding, Affiant was conveyed assets that had been accumulated during the parties' marriage, including, but not limited to, silver.

From the time of their divorce, until the time of a phone call described below, Affiant had never inquired into, demanded, or asked for any of the assets conveyed to Affiant in connection with the divorce proceeding.

However, at a certain point in time, believed to be in the year 2006, Affiant received a phone call from John Henry Wilkes and an individual he identified as his wife, inquiring into the silver, and requesting that it be returned to Mr. Wilkes.



EXHIBIT
C

During the time that Affiant and John Henry Wilkes were married, it was apparent that insuring that his only daughter, Queen Hinkle, and his grandchildren be taken care of financially was important to him.

LOUISE WILKES

SWORN TO AND SUBSCRIBED, before me, this 21st day of December, 2007.

NOTARY PUBLIC

Hinkle(q)-aff1218

NEIDRA S. KENNEDY
Notary Public, State of Ohio
My Commission Expires
November 29, 2011

AMERICAN GENERAL        :      CIVIL ACTION NO. 3-07-222
LIFE INSURANCE COMPANY

VERSUS               :      SECTION C (JUDGE TYSON)

EVELYN JACKSON WILKES and
QUEEN ESTER WILKES HINKLE   :      MAGISTRATE 1 (RIEDLINGER)

---

## AFFIDAVIT

STATE OF FLORIDA

COUNTY OF _Palm Beach_

BEFORE ME, the undersigned authority, personally came and appeared:

### QUEEN HESTER WILKES HINKLE

who, after being duly sworn, did state:

Affiant is the daughter and only known child of John Henry Wilkes.

Affiant and her father were very close. To be more specific, until approximately May of 2006, she and her father spoke on almost a daily basis . These conversations took place by phone, since Affiant lives in the State of Florida and her father was living in the State of Louisiana.

It was in a phone conversation in May, 2006, that her father informed her that he had recently married.

Shortly after this phone conversation, in May, 2006, she became isolated from her father. To be more particular, when she attempted to call him, she learned that his phone number had changed. The sister of John Henry Wilkes also called Affiant concerned that she could not reach her brother, and inquired into his phone number. Fortunately, John Henry Wilkes did call Affiant two or three weeks later, at which time she retained his new phone number. However, when she attempted



EXHIBIT

D

to call him, she learned the phone number had again been changed. While Affiant was able to obtain the new number, without assistance from her father or his new wife, this process, the changing of his phone number, continued up to the time of the death of John Henry Wilkes.

QUEEN HESTER WILKES HINKLE

SWORN TO AND SUBSCRIBED, before me, this 19th day of December, 2007.

_____
John N. Samaha,
NOTARY PUBLIC
La. State Bar Roll #11676

Hinkle(q)-aff1219(A)

NOTARY PUBLIC-STATE OF FLORIDA
Latasha Pierce
Commission # DD460198
Expires: AUG. 09, 2009
Bonded Thru Atlantic Bonding Co., Inc.

```
 1                   UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF LOUISIANA
 2

 3
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 4                                            *
                                              *      COPY
     AMERICAN GENERAL LIFE                    *
 5   INSURANCE COMPANY                         *
                                              *
 6   VERSUS                                    *      NUMBER 3:07-22
                                              *      SECTION "C"
 7   EVELYN JACKSON WILKES AND                 *
     QUEEN ESTER WILKES HINKLE                 *
 8   (RIEDLINGER)                              *
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 9

10              TESTIMONY OF EVELYN WILKES taken by
           the Defendant, Queen Ester Wilkes
11         Hiinkle pursuant to Notice and the
           within Stipulation, at the Law
12         Offices of Perry, Atkinson, Balhoff,
           Mengis & Burns, L.L.C., 2141 Quail
13         Run Drive, Baton Rouge, Louisiana
           commencing at 10:00 A.M., on
14         Wednesday, November 28th, 2007

15

16        B E F O R E:    GINA L. DELATTE
                          Certified Court Reporter
17

18                  COPY

19

20              JUDY P. FOUST, INC.
           CERTIFIED COURT REPORTERS
21          145 ST. JOSEPH STREET
         BATON ROUGE, LOUISIANA   70802-5739
22
                  (225) 344-2270
23

24                    EXHIBIT

25                    E
```

EXHIBIT
E

JUDY P. FOUST, CERTIFIED COURT REPORTERS
(225) 344-2270

```
 1    Q.    So he would have been around 70 years old
 2    at the time of his death?
 3    A.    No.  John was 69.
 4    Q.    That's fine.  You gave me his date of
 5    birth; I can figure it out.  How and where did
 6    you meet Mr. Wilkes?
 7    A.    I could be wrong on that.  I'm sorry, it's
 8    been a lot I've been dealing with over the last
 9    year and I'm surprised at some of the things --
10    Q.    How and where did you meet him?
11    A.    -- I've forgotten.  Excuse me?
12    Q.    How and where did you meet Mr. Wilkes?
13    A.    I was taking the bus.  I had never learned
14    to drive.  When I was making enough money I used
15    to send my son $300 a month to MIT and I used to
16    explain to everyone that was my car note, so
17    even though --
18    Q.    Let's kind of --
19    A.    -- he was on a full scholarship and so I
20    was on the bus, I had never learned to drive,
21    and I met John on the bus.
22    Q.    So he was also a passenger on the bus?
23    A.    Yes.
24    Q.    And when was that, approximately?
25    A.    Around November.
```

```
 1   Q.    Of what year?
 2   A.    I think that was 2005.
 3   Q.    And I take it that you and Mr. Wilkes
 4   struck up a conversation?
 5   A.    Yes.
 6   Q.    And did you both get off at the same
 7   location or did you get off at different
 8   locations?
 9   A.    We got off at the same location to wait
10   for another -- for our connections.  He was
11   going one way, I was going another, but we had
12   to sit and wait for another bus and we had
13   already begun talking, because I struck up a
14   conversation with him, is the way he was dressed
15   with an overcoat, a hat, everything.  It seemed
16   to be a New York style.
17             I said to myself, hey, here's someone
18   from the East Coast and I struck up a
19   conversation with him.  And when we got off the
20   bus to wait for our connection we began talking
21   and we had to wait a better part of an hour, the
22   buses kept going by, but they were not the
23   correct bus and we talked the whole time.
24   Q.    Was Mr. Wilkes from the East Coast?
25   A.    He grew up in New York to about the age of
```

```
1              MR. ATKINSON:

2                   If you can't remember that's fine.

3         Just the best of your memory.

4                          EXAMINATION

5    BY MR. SAMAHA:

6    Q.    Let me ask you this, approximately how

7    long was it after you met Mr. Wilkes that you

8    married Mr. Wilkes?

9    A.    From November to March; that's three,

10   approximate five, approximate four.

11   Q.    So you married in 2006; correct?

12   A.    Yes.

13   Q.    Because he died in 2006, did he not?

14   A.    In December.  Yes, we were only married

15   nine months.

16   Q.    When you met Mr. Wilkes and then after you

17   married Mr. Wilkes, did he require any sort of

18   physical or mental assistance from you?

19   A.    No.  I married a man -- I married a man

20   who was like any other man.

21   Q.    So he didn't require any assistance from

22   you either physically or mentally?

23   A.    No.

24   Q.    Did you and he continue to get around town

25   on public transportation?
```

1    of '06?

2    A.    Yes.

3    Q.    Now were you aware that on or about

4    October the 9th of 2006 that an effort was made

5    to increase the benefits on his life insurance

6    policy by an additional $100,000?

7    A.    You know I wasn't at first because he

8    didn't tell me.  He didn't tell me that he had

9    also stopped my life insurance.  I had also gone

10   there --

11   Q.    Just answer my question.  Were you aware

12   that he had increased or attempted to increase

13   in October of '06 --

14   A.    Not initially.

15   Q.    -- the benefit -- when did you discover

16   that?

17   A.    When he came home from --

18         MR. ATKINSON:

19             I'm going to object to the point that

20         it calls for any kind of privileged

21         communications between her and her

22         husband, which obviously that would

23         entail.

24                        EXAMINATION

25   BY MR. SAMAHA:

```
 1    Q.    Well just tell me when you discovered that
 2    that effort had been made.  Not any discussions
 3    between you and Mr. Wilkes.
 4    A.    In October, right after, but I didn't know
 5    he was going down there to do that.
 6    Q.    Going down there; where do you mean?
 7    A.    To AIG.  He was concerned about his
 8    health.
 9    Q.    Where is AIG located in Baton Rouge?
10    Where did you go to?
11    A.    I'm sorry, you would know better than me.
12    I don't drive and --
13    Q.    Do you know the name of the business?  Is
14    it AIG or is it an agency?  Is it a person?
15    A.    It's Michael Olinde and yeah, I think he
16    said it's not called AIG.  They sell -- I think
17    AIG is one of their products, but I don't
18    remember the street address.
19    Q.    Did you play any role whatsoever in trying
20    to get the additional $100,000 of coverage?
21    A.    I swear on my dead son's life, no.  I did
22    not know anything about it until he came home.
23    Q.    So you didn't call anybody, you didn't
24    take Mr. Wilkes there --
25    A.    No.
```

```
 1    Q.    -- you didn't play any role in his effort
 2    to try to get an additional --
 3    A.    Mr. Olinde wrote the insurance that day
 4    with him.  Mr. Olinde can tell you, John
 5    appeared there on his own.
 6    Q.    Okay, that's fine.  When did you become
 7    aware that Mr. Wilkes had two life insurance
 8    policies on his life?
 9    A.    Several months after we married -- not
10    after we married, I'm sorry.  After we met.  A
11    month or two after we met.
12    Q.    What other assets did he have other than
13    those life insurance policies when you met?
14    A.    Nothing and I was mad about it, because he
15    had a good income and no one was --
16    Q.    So he had nothing to his name other than
17    his clothes --
18    A.    Nobody was taking care of him in the way
19    that he should have been living and the way that
20    he could have.
21    Q.    What did you and he acquire after you got
22    married?  You acquired a Lincoln; is that right?
23    A.    Yes, we bought the car and then we bought
24    the Chrysler.
25    Q.    So you had a Lincoln and a Chrysler?
```

```
 1     A.     Yes, that's what I'm saying, I'm hoping
 2     I'm remembering this correctly.
 3     Q.     Okay.  Now when they came in the mail who
 4     opened the mail, you or Mr. Wilkes?
 5     A.     John and I opened any of the mail.  We
 6     were husband and wife.  He opens mail, I open
 7     mail.
 8     Q.     Would it be fair to say then that you
 9     don't recall who opened the mail from AIG or its
10     agent?
11     A.     I would think John because it said John,
12     but at any time I can open the mail that has his
13     name on it, he can open mail that has my name on
14     it.
15     Q.     That's fair.
16     A.     We had no problem with that.
17     Q.     At some point though you became aware that
18     the forms that you had requested had come in?
19     A.     Yes, and I don't recall how that
20     happened.  I don't know.
21     Q.     But then once they came in, you do recall
22     that you filled them out?
23     A.     Yes.
24     Q.     Did they come at the same time or --
25     they're two policies.  Did they come at the same
```

1    Q.    Was it his lawyer or was it a lawyer that

2    didn't represent him?

3    A.    Did they write the name -- it had been his

4    lawyer, a lawyer who had represented him.

5    Q.    Well if you don't know --

6    A.    And he had did something wrong with the

7    monies.

8    Q.    Okay.  Let me turn to your son that you

9    claim Mr. Wilkes tried to adopt; correct?

10   A.    Uh-huh.  That I claim?  I have the

11   documents from the VA that my husband wrote.

12   Q.    The effort was made to adopt your son;

13   correct?

14   A.    Excuse me.  You know you almost make me

15   think -- I wonder how could anybody be so

16   foolish to believe all of these lies from Queen

17   Hinkle and you almost make me think --

18   Q.    Let's try to help him make his

19   connection.

20        MR. ATKINSON:

21             Listen to the questions, answer them

22        and --

23                        EXAMINATION

24   BY MR. SAMAHA:

25   Q.    So with the VA Mr. Wilkes purportedly

```
 1    sought to adopt your son; correct?

 2    A.    Yes.

 3    Q.    And that would have made your son entitled

 4    to benefits; would it not have?

 5    A.    Yes.

 6    Q.    And what type of benefits would your son

 7    have received had he been adopted -- had he

 8    adopted your son?  What kind of benefits would

 9    your son have received?

10    A.    I think they would have added maybe $200,

11    a little more.  Around 200, something like

12    that.  I don't know exactly.

13    Q.    To who, your son?

14    A.    It's on the schedule and the VA could tell

15    you.

16    Q.    How old was your son at the time that he

17    was trying to adopt him?

18    A.    One moment.  He just turned 24 and John

19    died December, so he would have been more like

20    22, maybe.

21    Q.    But he would have --

22    A.    Maybe --

23    Q.    Your son would have received benefits as a

24    result of Mr. Wilkes' death; correct?

25    A.    Yes.  My son called John daddy and John
```

1    loved my son.

2    Q.    Was the adoption carried out?

3    A.    No.

4    Q.    Do you know why it didn't go through?

5    A.    Yes.

6    Q.    Why is that?

7    A.    Because my son -- they told me after a lot

8    of tests that he scored senior college level in

9    his reading and college level in other subjects,

10   like my son who passed away in January who had

11   the genius IQ also, but he still may not be able

12   to take care of himself and so I thought if he

13   were left on his own he needed to have income to

14   take care of himself.

15   Q.    Your son's --

16   A.    So $200 would have only been money

17   subtracted from his disability income so it

18   wasn't -- John meant well, but it wasn't

19   practical.

20   Q.    In other words, it wouldn't have helped

21   him financially, your son?

22   A.    It would have -- I thought it would have

23   helped him in that he would have had VA benefits

24   which are good, his medical and things like

25   that, but no, I thought it might not be the best

```
 1    BY MR. GEARY:

 2    Q.    Did you assist him with getting his

 3    finances squared away so that the premium could

 4    be paid?

 5    A.    Uh-huh, because not just for the premium,

 6    we weren't saving any money for the house and he

 7    wanted a house real bad.

 8    Q.    I don't want to confuse you, but this is

 9    before you were married, I think; isn't it?

10    A.    No, we were living together.

11    Q.    So by January you were living together --

12    A.    Yes.

13    Q.    -- but I think March 11th was the date of

14    your --

15    A.    -- marriage.

16    Q.    If you would give that to the court

17    reporter and I'll ask her to attach it as

18    Exhibit 3.  She's just going to put it in her

19    stack.  When the change of beneficiary forms

20    were submitted to name you as the beneficiary,

21    the company is going to testify that the first

22    form that came in didn't list the policy number,

23    so they sent a letter back to Mr. Wilkes and

24    then that was corrected and then it was

25    submitted again; do you remember any of that?
```

```
1    Q.    And if I understand what you were telling
2    Mr. Samaha earlier, everything on this form is
3    your handwriting --
4    A.    Uh-huh.
5    Q.    -- except for Mr. Wilkes' signature?
6    A.    And the date.  I see the signature and he
7    dated it.
8    Q.    Okay.  Did Mr. Olinde play any role in
9    assisting in the preparation of this form?
10   A.    No.  When John originally got the two
11   policies, I think they both were written by
12   Judge Francis and then in October when John went
13   back to get the other $100,000, to increase it,
14   that was done by -- all of that handwriting on
15   those pages were by Mr. Olinde and then John
16   signed.
17   Q.    But as far as this form goes, this was
18   just you filling out the form?
19   A.    Yes.
20   Q.    Did you all do that at home?
21   A.    Yes.
22   Q.    So you didn't go to American General's
23   office to do that?
24   A.    No.
25        MR. GEARY:
```

```
 1              Let's label that as Exhibit 5 to the
 2         deposition.
 3         THE WITNESS:
 4              They didn't tell me that was
 5         necessary or we would have done whatever
 6         they had instructed us to do.
 7                        EXAMINATION
 8    BY MR. GEARY:
 9    Q.    I'll show you another one.  This is a
10    letter that the company wrote after receiving
11    that form.  This is a letter of March 20, '06.
12    A.    I saw that.
13    Q.    You saw that letter.  That will be Exhibit
14    6 to the deposition, please.  I'm going to ask
15    you the same question about the other policy.
16    I'm showing you change of beneficiary form for
17    Number X9011409.  Do you recognize --
18    A.    John's signature and date.
19    Q.    The rest of the handwriting is yours?
20    A.    Yes.
21    Q.    Did you know what irrevocable beneficiary
22    meant?
23    A.    No, that's what I'm saying, I didn't know
24    exactly, but I thought it meant it can't be
25    changed and you hear so much bad news.  It
```

 1    happened to my sister.  My sister's husband --
 2    my sister's husband had a drinking problem and
 3    he went out one day with his daughter from a
 4    previous marriage and changed the beneficiary of
 5    the policy and he and my sister had just had a
 6    baby, an infant and they were together more than
 7    15 years.
 8              He would have never wanted her not to
 9    have the insurance to take care of his children,
10    but his daughter came to the house and got him
11    to drinking and left the house with him and the
12    next thing she knows, when he died, on that
13    date, she got him to change the beneficiary
14    while he was under the influence of alcohol, and
15    so I know that people can do that.
16              Then a friend told me something
17    devious somebody had did about insurance
18    policies, so I just thought -- and John told me
19    that's the way he wanted it, because he said --
20         MR. SAMAHA:
21              Objection, objection, that's hearsay.
22         THE WITNESS:
23              -- I would never change it.
24         MR. SAMAHA:
25              I'd ask that her answer be stricken

```
 1              over $9,000 and I have a contingency fee
 2              contract with her for 15 percent.
 3         MR. GEARY:
 4              Do you have some questions?
 5         MR. SAMAHA:
 6              I have a few questions.
 7         MR. ATKINSON:
 8              I have some questions real quick.
 9                   RE-EXAMINATION
10    BY MR. SAMAHA:
11    Q.    I just had very few questions.  You had
12    mentioned that you and Mr. Wilkes had lived
13    together prior to your marriage.
14    A.    Uh-huh.
15    Q.    About when did you all start living
16    together in relation to your marriage; a month,
17    two months?
18    A.    I think it was some time in December.  I
19    think in December -- it was in December.
20    Q.    December of '05?
21    A.    Yes.
22    Q.    The other question, one of the other
23    questions I had is, I think you said you met Mr.
24    Wilkes in around November of '05 --
25    A.    Yeah, I was saying late -- I remember the
```

JUDY P. FOUST, CERTIFIED COURT REPORTERS
(225) 344-2270

1    holidays, is all I remember exactly, and then

2    something about when he was going to start

3    helping pay bills.  So as I try to figure that

4    out, I think it was about -- I met him either

5    around Thanksgiving or I had Christmas in my

6    mind coming up.

7    Q.    Being that as the time that you met him

8    and then you also testified that in September he

9    started having some clot problems, blood clot

10   problems.  From the time that you met him in

11   November, until September, is it your opinion

12   that from a physical point of view and a mental

13   point of view he stayed pretty constant?  In

14   other words, there was no deterioration?

15   A.    No.  Before September -- everything

16   seemed -- well, he was older and I thought he

17   was thin and I got the doctor to give me

18   something to increase his appetite, but, yeah --

19   Q.    He appeared pretty much --

20   A.    Yes.

21   Q.    The way he was in November of '05 from

22   your prospective was the way he was in, say,

23   August of '06, from a physical and mental

24   prospective?

25   A.    No, before August.  I think it was maybe a

EVELYN WILKES                           145

1   couple of months before September when we ended

2   up spending five nights in the hospital.  It was

3   a couple of months I think before that, because

4   we'd see Dr. Blaize about every four weeks, just

5   as a routine.

6   Q.    So let's say -- let's change September to

7   June of '06.  From November of '05 to June of

8   '06, there appeared to you, correct me if I'm

9   wrong, to be no physical or mental deterioration

10  in his condition?

11  A.    No.  No.  My baby used to preach at the

12  church, say the prayer at the church, sing --

13  Q.    So your answer is, is that he was about --

14  A.    -- teach me to drive.

15  Q.    Your answer is that he was about the same

16  during that time period; correct?

17  A.    Yes.

18  Q.    And then I think you also said that, and

19  this is my last question, you said that at some

20  point in this case you and Mr. Geary used to

21  talk on the phone at least once, maybe twice;

22  you talked on the phone with him?

23  A.    Yeah, maybe twice.

24  Q.    Isn't it correct that in those phone

25  conversations and part of those phone

JUDY P. FOUST, CERTIFIED COURT REPORTERS
(225) 344-2270

```
 1            MR. SAMAHA:

 2                 That answers my question.  I have

 3            no further questions.  Thank you.

 4            THE WITNESS:

 5                 And then with his hand --

 6            MR. ATKINSON:

 7                 That's good.

 8            THE WITNESS:

 9                 The carpal tunnel, like I told you,

10            his right hand, so he would want me to

11            help him button things or help him pull up

12            the diaper, that stuff came gradually and

13            a little -- and he didn't have to wear the

14            diaper.  It wasn't he had regular

15            incontinence, he had a prostate.  That

16            happens to a lot of men.

17                           EXAMINATION

18       BY MR. ATKINSON:

19       Q.    Evelyn, when John died did you call Queen

20       to inform her?

21       A.    Immediately.  As soon as I got back from

22       the hospital.

23       Q.    Was his death sudden or was he in the

24       hospital a little while?

25       A.    He was in the hospital for the first time
```

1    in September.  Remember, I told you for the two

2    months prior to September we had been explaining

3    to Dr. Blaize that his breathing was getting

4    worse --

5    Q.    All right.  Just listen to my question,

6    when he died though.

7    A.    He had been in --

8    Q.    It was in December 2006; correct?

9    A.    Yes.

10   Q.    What happened?  He went to the hospital --

11   A.    No.  On the day he died, you want to

12   know?

13   Q.    Right.

14   A.    First you had asked me about the

15   hospital.  We had been in the hospital, stayed

16   about five days in September, because he said it

17   was a pain and that's when we discovered this

18   shortness of breath he had started getting was

19   really blood clots that had traveled to his

20   lung.

21             So then we went back to the hospital

22   in October, the emergency room again, because I

23   had more confidence at this point -- as much as

24   I liked Dr. Blaize, I had more confidence in the

25   emergency room, because then they'd pull out all

X9019202

03/13/2006 13:46:0017276 998P

## AIG AMERICAN GENERAL

**Change of Beneficiary**

☒ **American General Life Insurance Company (AGL),**
☒ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
☐ **The Old Line Life Insurance Company of America (OLL),** P.O. Box 4373, Houston, TX 77210-4373
Members of American International Group, Inc.
**Instructions for completing this form are listed on the back.**

| 1. | **CONTRACT IDENTIFICATION** | CONTRACT No. X9019202 |
| | | OWNER John H. Wilkes  226.773.85 33 0811   SSN/TIN or EIN: 092 28 6801 |
| | ☒ Check Here if New Address | ADDRESS: 565 McClelland Dr. 225  PHONE No. 225.855.614 H. |
| | | Baton Rouge LA 70805   cell 562.506.7176 85 |
| | | EMAIL ADDRESS (optional): EJackson1948@msn.com |
| | | INSURED/ANNUITANT (if other than Owner): |

| 2. | **BENEFICIARY DESIGNATIONS** | One or more of the following may be checked.  If nothing is checked, the designation will be in effect for the base insured only. |
| | | Designation is in effect for: ☐ Base Insured  ☐ Spouse Insured  ☐ Other _____ |

**A. PRIMARY**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|

Evelyn Jackson Wilkes   wife
5665 McClelland Dr. 225, Baton Rouge, LA 70805
094.42.1832 SSN

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:
N/A   Dated: _____
_____ Legal Name of Trust

**B. CONTINGENT**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|

N/A

Dated: _____
_____ Legal Name of Trust

| 3. | **OPTIONAL CLAUSES** | One or more of the following may be checked if desired: |
| | | ☐ POSTPONEMENT CLAUSE - COMMON DISASTER    ☐ CHILDREN'S CLAUSE - PER STIRPES |
| | | ☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN   ☒ IRREVOCABLE BENEFICIARY |
| | | Dated: _____ |
| | | Name of Trust/Trustee |

| 4. | **SIGN HERE FOR ABOVE REQUEST** | The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant. |

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

X  John Wilkes                              3-7-06
Signature of Owner        Date        Signature of Co-owner        Date
(or other party having interest in contract)

_____                    _____
Witness        Date

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

Page 1 of 2

EXHIBIT #5

PENGAD 800-631-6989

**AIG** **AMERICAN GENERAL**

**Change of Beneficiary**

04/03/2006 14:59 0017330 6225

**American General Life Insurance Company (AGL)**
**AIG Life Insurance Company**
**AIG Life Insurance Company of Puerto Rico**
*Member companies of American International Group, Inc.*
☑ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
**Instructions for completing this form are on the back.**

*Please print or type all information except signatures.*

| | | | |
|---|---|---|---|
| **1.** | **CONTRACT IDENTIFICATION** | CONTRACT No.: X9011409 | |
| | ☑ Check Here if New Address | OWNER: JOHN HENRY WILKES  SSN/TIN OR EIN 092.78.6501 | |
| | | ADDRESS: 5665 McClelland Dr.  PHONE No. 2258108529 | |
| | | # 225 Baton Rouge LA 70805  cell | |
| | | EMAIL ADDRESS (optional): Wolfgang_99@MSN.com | |
| | | INSURED/ANNUITANT (if other than Owner): _____ | |

**2. BENEFICIARY DESIGNATIONS**

One or more of the following may be checked. If nothing is checked, the designation will be in effect for the base insured only. Must be of legal age, if not Minor Beneficiary Clause must be completed. Beneficiary Designation is in effect for: ☐ Base Insured  ☑ Spouse Insured  ☐ Other

**A. PRIMARY**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| EVELYN JACKSON WILKES, SPOUSE, 5665 McClelland Dr. 225 Baton Rouge, LA 70808; SSN: 094.42.1832 | | | | 100% |

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:

Dated: _____

_____ Legal Name of Trust

**B. CONTINGENT**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |
| | | | | |

Dated: _____

Legal Name of Trust

**3. OPTIONAL CLAUSES**

One or more of the following may be checked if desired:
☐ POSTPONEMENT CLAUSE - COMMON DISASTER    ☐ CHILDREN'S CLAUSE - PER STIRPES
☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN    ☑ IRREVOCABLE BENEFICIALLY

Dated: _____

_____ Name of Trust/Trustee

**4. SIGN HERE FOR ABOVE REQUEST**

The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant.
Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

_John H Wilkes_  3-29-06
Signature of Owner    Title

_____  _____
Signature of Co-Owner, Assignee, Witness    Title

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

109 Rev0904

EXHIBIT #13

PENGAD 800-

Member of American International Group, Inc.
P.O. Box 4880 • Houston, TX 77210-4880 • 800-528-2011 • TDD 217-528-2011 • www.americangeneral.com
Securities Distributed by American General Equity Services Corporation